**MILLER & MILLER AUCTIONEERS, INC.,**
Appellant (Garnishee below),

v.

**G. W. MURPHY INDUSTRIES, INC.,** Appellee (Plaintiff in Attachment below).

No. 4356.

Supreme Court of Wyoming.

Jan. 6, 1975.

Rufus S. Garrett, Jr., Garrett, Settle & Callaway, Fort Worth, Tex., and James L. Applegate, Hirst, Applegate & Dray, Cheyenne, for appellant.

Donald R. Winship, Everett, Everett, Winship & Kastanek, Casper, for appellee.

Before PARKER, C. J., and McEWAN, GUTHRIE, McINTYRE,* and McCLINTOCK, JJ.

Mr. Justice McCLINTOCK delivered the opinion of the court.

Miller and Miller Auctioneers, Inc., hereinafter referred to as Miller, appeals the personal judgment against it entered by the District Court of Converse County, Wyoming, in favor of G. W. Murphy Industries, Inc. (Murphy) in the amount of $25,945.90.

The proceeding began as an action by Murphy against Willey Drilling, Inc., a corporation (the company) and James C. Willey, dba B & W Drilling Company (Willey). By the first count of the complaint Murphy sought a combined judgment against both defendants in the amount of $20,079.48, which claim was in the second and third counts broken down as between the company and Willey, claiming $12,693.57 against the company and $7,386.21 against Willey individually. Service was had upon both the company and Willey in Converse County and on the same day notice of garnishment under writ of attachment issued at the time of the summons was served upon Miller through its corporate president, also found in Converse County. By this notice Miller was notified that Murphy claimed that Miller had property or credits belonging to defendant and that Miller, as garnishee, should hold such property and be liable to Murphy therefor from the time of service of the notice.

At the time of the service, endorsed on the notice as having been made by the sheriff at 2:25 p. m. on January 12, 1971, the date of filing of the complaint and issuance of the summons, Miller had completed an auction sale of certain oil well drilling equipment, owned either by the company or Willey. At the time of such service Miller had in its possession either cash or collectable checks in the sum of $148,254.25, the total amount realized through the auction sale. Miller at that time ignored the notice, paid out all of the proceeds of the sale to others than Murphy except $2,942.03 and on or about January 27, 1971 commenced an interpleader action in the United States District Court for the District of Wyoming, naming the company, Willey, Murphy, and other parties as defendants. On that date Miller secured an order of the federal court staying any action or proceeding by Murphy or others until further orders of that court. Upon appeal to the United States Court of Appeals for the 10th Circuit it was therein held that the district court had no jurisdiction of the action except to settle a claim which had been filed by the United States for a sum in excess of that paid into court by Miller, for which amount judgment was directed against it with the balance of the suit to be dismissed, Miller & Miller Auctioneers, Inc. v. G. W. Murphy Industries, Inc., (10 Cir.) 472 F.2d 893. Payment of this judgment left Miller in a deficiency situation.

In the meantime and on February 2, 1971, Murphy secured default judgment against the company and Willey in the Converse County District Court, the judgment being broken down into two amounts, the first against the company only for $12,697.23 plus interest, and the second against the company and Willey dba B &

---

* Mr. Justice McIntyre participated in the hearing of oral arguments but died before the formulation of the opinion.

W Drilling Company in the amount of $7,386.21 plus interest. With interest and costs the total amount of the default judgment came to $21,557.21, which amount, with further accruing interest, represents the amount of the judgment against Miller attacked on this appeal.

After filing of memoranda and exchange of letters in the trial court it issued a preliminary and later a final decision holding in favor of Murphy and directing the preparation of a judgment. In addition to finding generally in favor of Murphy the judgment finds that on the day of service of the garnishment Miller had within its possession and control money and credits belonging to Willey Drilling, Inc. and James C. Willey in the amount of $148,254.25, being "the proceeds from the sale of personal property which were bound by the Writ of Attachment and Garnishment Notice on January 12, 1971"; and that Miller was liable to Murphy from the time of service of notice of garnishment for money and credits which it had voluntarily disbursed not in response to the notice. However, allowance was made for $56,415.05, representing costs of advertising the sale, advances to the company, commissions, and the amount paid the United States, leaving $91,839.20 available to satisfy the attachment. Judgment was entered in the gross amount mentioned without breaking it down as between corporate or individual property which had been sold.

The action had been submitted to the trial court on the pleadings in the state court, including the answer of Miller to the notice of garnishment, filed after completion of the proceedings in the federal courts, and Murphy's traverse thereof, together with a "shears-and-paste-pot" transcript of exhibits and testimony from the federal trial, which documents were accompanied by a stipulation that without admitting the truth of the testimony, the parties were in agreement that if the witnesses were present in the state court, they would testify in the same way. While the result

is a difficult record for us as well as the trial court, we believe that the following facts are substantially established.

Mr. Willey had first been associated in a partnership engaged in the drilling of oil wells. Some equipment had been acquired by this partnership and liens thereon created which were still in existence at the time of the sale and attachment proceedings. In late 1968 Willey bought out his then partner, Baker, in a manner which is not too clear from the record, but left at least some of these liens in effect. At some undisclosed date he formed the corporation, Willey Drilling, Inc., but apparently did little or nothing about making a formal transfer of the business property to the corporation. He did testify without objection that it was his intention to put all property into the corporation except an airplane, title to which was intentionally left in him and remained in him at the time of the sale. Various trucks and automotive equipment requiring formal titles under Wyoming law remained in his name or the partnership. The record does not diclose what amount of either titled or untitled property may have remained in his name or that of the partnership so we cannot even guess at the legal title to the property which was subsequently sold at the auction sale. From what does appear in the record there seems to have been no change in his operations from the time he took over management of the partnership to the time of the sale.

Some time prior to November 25, 1970 Willey decided to dispose of all equipment involved in the operation and on that date executed an instrument entitled "Auction Agreement", signing the instrument in handwriting "Willey Drlg Inc. by James C. Willey". The instrument also shows execution in behalf of Miller by Dan C. Abrams, shown by his testimony to have been a vice president at that time. There is nothing to indicate that Willey signed the agreement in any individual capacity but on the face of the instrument, in a blank space in the printed form there is

the following notation under the printed heading, "Property to Be Sold":

"Inventory attached.

"$35,000 advance to be deducted from Proceeds of Sale.

"$10,000 advanced the 25th day of Nov–1970

"$25,000 to be advanced the 10th day of Dec–1970"

The attached inventory lists a considerable amount of property, presumably all of the property sold for $148,254.25, and specifically includes the airplane. No attempt is made in the inventory to distinguish between property title to which may have been in the corporation and title to which may have been in Willey or B & W Drilling Company.

Again there is no definite showing in the record but a substantial part of this property appears to have been subject to formal written liens although it does not appear that the liens on titled equipment were in all instances endorsed on the certificate of title. The auction agreement itself grants the auctioneer a lien on the property with power of sale "for all funds advanced by Auctioneer to pay off liens on said property, expenses of make-ready and sale, commission and other funds advanced to or for the benefit of the Owner in connection therewith."

All the property was delivered into the possession of Miller as auctioneer and after an extensive advertising campaign a sale was held at Douglas, Wyoming on January 12, 1971, apparently being completed just before the service of the notice of garnishment. An advertising brochure states that the sale will be for cash, everything will be sold, without minimum bids and without reservations.

Miller testified without objection that he was selling property for Willey Drilling Company without defining just what he meant by that. He had conversations with Willey prior to the sale and either he or his representative Abrams had talked with creditors, particularly Associates Finance Company, claiming a lien for $59,899.58.

Concerning his conversations with Willey he specifically testified:

"Q. Prior to the auction sale I will ask you whether or not Mr. Willey had instructed you as to what lien claimants were to be paid out of the auction sale. A. Yes.

"Q. Would you state whether or not the lien claimants as shown on the second page of plaintiff's Exhibit 5 are the same lien claimants that you had agreed to pay to the time the auction was held. A. Yes, sir."

Willey testified without objection as follows:

"Q. Did you authorize and direct the auctioneers to pay the lien of Mr. Baker and the Converse County Bank and the Associate Investment lien and the Massey-Ferguson lien and the Fort Motor Credit lien and the GMAC lien, out of the auction proceeds. A. Yes, sir.

"Q. And you had directed them to do that, prior to the sale or—A. We had discussed it, I guess, and I just realized that it was going to be done that way. That was fine with me.

"Q. It was understood that those would have to be paid off in full out of the proceeds of the sale. A. Yes, sir.

The so-called Converse County bank payment in the amount of $11,843.85 is in a peculiar situation, not entirely clear from the record. Actually, the bank was paid off some time before the sale but the payment seems to have been made by someone other than Willey and there remained an amount due from Willey to Baker, and Baker instructed the bank not to release the lien until he had been paid. The payment of $11,843.85 made to the bank was for the benefit of Baker and as a result of this payment certain releases were filed which otherwise would not have been obtained. In addition to the foregoing express authorization by Willey to pay off Baker's claim Baker, who had heard of the sale and was present before it began, testified that he was told by Willey that he would be paid out of the sale, which infor-

mation he passed on to Miller and arrangements were made to pay him off and secure the releases.

We therefore conclude that the record shows without contradiction that prior to completion of the sale Miller had been advised by Willey and had agreed to hold the proceeds of the sale for the benefit of the five creditors who were paid off, regardless of the value of the property subject to the lien.

As we understand the proceedings in the trial court, as shown by the memoranda, decision letters and judgment, Murphy had the garnishment notice served upon Miller on the theory that the latter had property (cash and checks) in its possession that belonged to Willey or his company, both of whom were indebted to Murphy as asserted in the separate counts of the complaint, later reduced to judgment. On this theory Miller could not, after receipt of the notice of garnishment make payments of those funds belonging to Willey and was liable for the full amount of the judgment. Miller on the other hand contended and still contends that because of agreements with Willey that Miller would pay off the five creditors mentioned, there was no money owing to Willey and therefore its answer to that effect was proper. As it quoted to the trial court from 6 Am.Jur.2d Attachment and Garnishment § 460, pp. 881, 882:

"* * * [T]he attaching or garnishing creditor stands in the shoes of the defendant and is in no better position with regard to the attached or garnished property or debt than the defendant."

The judgment itself discloses that the trial court was of the view that the proceeds of the property sold at auction belonged to Willey and his company. His rejection of Miller's theory is disclosed in his decision letter where he states:

"* * * Contractual relations and instructions between owner and auctioneer are not the criterion of attachability. Miller was Willey's agent; the goods for sale remained essentially Willey's. Willey could not, merely by instructing Mill-

er and purporting to grant a lien in favor of prior creditors, confer upon them an interest in goods or proceeds superior to an attaching creditor."

■ While this statement was made after a long and diligent search to ascertain the facts and applicable law, we think the decision is based upon an erroneous understanding of the law. We hold that until Miller was served with the garnishment notice Willey had the right to control his property as he saw fit and to enter into contracts or arrangements for its disposition, subject only to federal restrictions on preferences, none of which have been raised in this case. It was not a matter of establishing a lien which would be good against the subsequently attaching creditor.

We think the case is governed by the principle stated in American Jurisprudence, *supra,* and that whether the proceeds of the sale were Willey's is, we think, settled by two previous decisions of this court, National Association of Credit Men, Montana-Wyoming Unit v. Moss, Wyo., 349 P.2d 202 (1960). In that case Moss had given a chattel mortgage to the intervenor in the action and later arranged to have a public auction of his property, including this mortgaged property. Prior to the sale the chattel mortgagee wrote Moss and the auction sale clerk that it claimed the proceeds of the sale and any other disposition of the proceeds would be at the risk of the clerk serving in that capacity as a trustee. The sale was held and the money deposited in a bank account designated as the "Keith Moss Sale Account". Plaintiffs garnisheed these proceeds. Specifically recognizing the general rule that the lien of a mortgage on personal property does not attach to proceeds of sale thereof when the mortgagee consents to the sale, this court held that the money received at the sale "was not the unrestricted property of the defendant, but was money subject to the burden of the trust imposed upon it by the letter of December 12, 1958, as was indicated by the designation given to the deposit". (349 P.2d at 204.) This decision that the arrangements for the sale consti-

tuted the "auction clerk a trustee to receive and hold the sale's proceeds for the account of the mortgagee", 349 P.2d at 205, is said to be in harmony with the great weight of authority.

Cited in that case was our earlier decision in Thex v. Shreve, 38 Wyo. 285, 267 P. 92 (1928), where mortgaged livestock was sold at auction under an arrangement that the proceeds would be sent to a bank to be credited to the mortgagee. The auctioneer who conducted the sale deposited the proceeds in the bank to the credit of the mortgagor, where it was garnisheed by a creditor of the mortgagor. Referring to statutory proceedings in aid of execution provided in our law, the court in the earlier case said (267 P. at 96):

"They were not intended to enable the creditor to take funds which in truth do not belong to the debtor, and which should not, as a matter of equity, be applied to the payment of his debts."

It is apparent in both these cases that only the proceeds of the sale of the specifically mortgaged property was applied to the satisfaction of that mortgage debt, while in the present case it appears that (1) some secured creditors received more than the amount realized from the sale of the particular property to which their lien attached; (2) one creditor was paid whose claim of lien, if any, was by some process of subrogation to another lien which had been paid off by the individual but not released of record; and (3) some lien creditors may have been paid on the basis of liens which had not been so recorded or noted on titles as to constitute a complete and valid lien under our commercial code and recording laws. However, we think that the principle stated is broad enough to cover this situation because the governing principle is that the contract under which the property is sold by the auctioneer may govern the disposition of the funds so that upon completion of the sale the auctioneer does not have in his hands any money or property belonging to the original owner.

After reference to *Thex,* our later decision expresses the basis of its holding (349 P.2d at 206):

"* * * In consequence, we conclude that irrespective of any notice to the judgment creditors that the funds attempted to be reached by garnishment were subject to an implied trust, or were in fact held under agency or were otherwise not the funds of the judgment debtor and not under his unrestricted control, when the facts of their true character as not being funds of the debtor were shown, such moneys were not subject to garnishment but remained available to the satisfaction of the mortgage obligation."

If a debtor is free to deal with his property as he sees fit until such time as it is tied up by court action through attachment or garnishment, it appears to us to be of no consequence that some of the mortgaged property was sold for less than the amount of the lien and that proceeds of nonmortgaged property were used to pay a deficiency in the amount so received, or even that such proceeds were used to pay indebtedness that may have had no valid lien. As previously indicated, questions of unlawful preference have not been raised. This view we think is strengthened by reference to Bank of Hinton v. Swan, 156 Iowa 715, 137 N.W. 1032, 1033, quoted from at some length in *National Association of Credit Men.* Attaching creditors there sought to hold invalid an arrangement for sale between the mortgagor and mortgagee. The Iowa court conceded that the lien of the mortgage did not follow the proceeds but made this pertinent statement:

"Even if the intervenor had no lien of any kind upon the property sold, yet if Swan was indebted to said bank and entered into an agreement with it by which he would make his sale, and have the proceeds thereof delivered to or placed in the hands of the clerk or other designated person to be by said person paid over to the bank, that person would hold

such proceeds as *bailee* or *trustee* for the bank, and the fund would not be subject to garnishment at the suit of another creditor of Swan. [Emphasis supplied.]

*National Association of Credit Men* also refers to another case applying the trust fund principle, Farmers' State Bank of Alva v. Kavanaugh & Shea, 98 Okla. 119, 224 P. 525, referring to the Supreme Court of Oklahoma's disposal of the case in this language (349 P.2d at 207):

"* * * After noting there was no fraud intended and that under the general rule the lien of the mortgage did not follow the proceeds of sale of mortgaged property where mortgagee consented to the sale, the court held that as the sale was not conducted by the mortgagor but by a clerk of the sale, and the proceeds had never been in the hands of the mortgagor nor under his control, the clerk was constituted a trustee of the proceeds of the property sold, not liable to the mortgagor for any of the trust funds and hence performance of the trust could not be defeated by creditors of the mortgagor through garnishee process. Recognition was also given to the universally recognized rule of law that a creditor, as such, has no greater right than his debtor."

Under the principles just set forth, there is no distinction based upon the fact that proceeds have here been used for satisfaction of liens in excess of the sale value of the property. The matter of importance is the contract of the debtor with the auctioneer. As said in 2 Shinn on Attachment and Garnishment § 516, p. 893, cited with approval in Shortridge v. Sturdivant, 32 N.D. 154, 155 N.W. 20, 21:

"* * * A plaintiff by garnishment cannot place himself in a superior position as regards a recovery than is occupied by the principal defendant. The garnishee's liability is measured by his responsibility and relation to the defendant. He can be charged only in consistency with the subject of his contract with the defendant. And if by any preexisting bona fide contract his accountability has been removed or modified, it follows that the garnishee's liability is correspondingly affected; for the garnishment cannot change the nature of the contract between the garnishee and the defendant, nor prevent the defendant from performing his contract with third persons. * * * When a garnishee has contracted with the principal debtor that he will pay the money or deliver the property to some third person, then the plaintiff in garnishment cannot recover, because he is only placed by the garnishment in the position of the principal defendant, who could not himself recover from the person made the garnishee."

We find nothing in the record indicating that the agreement between Willey and Miller was not bona fide and we think that the trial court's judgment is based entirely on a rejection of this agreement. Since the facts are not in dispute and the error is in the legal principles that were applied to those facts, we find that the trial court was in error and the judgment is reversed.